United States District Court
Southern District of Texas
**ENTERED**
February 18, 2025
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHARISMA HANNIBAL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:22-CV-01330 |
| | § | |
| SHARMAYNE IVORY, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

In the early morning hours of December 26, 2021, what seemed to be a routine traffic stop escalated rapidly into an intense, life-threatening confrontation lasting just sixteen seconds. It started with Deputy Constable Sharmayne Ivory patrolling NRG Stadium in Houston, Texas. Around 1:15 a.m., Deputy Ivory saw someone driving erratically through NRG's parking lots and tried to initiate a traffic stop. But Charisma Hannibal, the driver, refused to pull over, triggering a pursuit that ended near the Houston Livestock Rodeo Warehouse. A brief but intense stand-off followed, and within sixteen critical seconds, Hannibal aggressively reversed her vehicle, prompting Deputy Ivory to discharge her firearm. Hannibal continued forward and accelerated toward Deputy Ivory and a nearby eyewitness, causing Deputy Ivory to fire several more rounds.

The Court must now decide whether Deputy Ivory's actions are shielded by qualified immunity. After reviewing the undisputed facts, the Court concludes that they are. Pending before the Court is Defendant Ivory's Motion for Summary Judgment. (Dkt. No. 50). For the following reasons, the Court **GRANTS** the Motion.

**I.      BACKGROUND[1]**

On Sunday, December 26, 2021, Deputy Constable Sharmayne Ivory was working the night shift at NRG Stadium patrolling the parking lots. (Dkt. No. 50-1 at 2). No one was supposed to be driving through the fenced-in lots, so Deputy Ivory settled in for what she expected to be a quiet, uneventful shift. (*Id.*).

Around 1:15 a.m., a black 2019 Infiniti SUV sped through the parking lot. (Dkt. No. 52 at 27, 30). Deputy Ivory observed that the driver was "driving erratically" and "traveling at a high rate of speed." (Dkt. No. 50-1 at 2); (Dkt. No. 52 at 30).

Deputy Ivory turned on her overhead lights to conduct a traffic stop and pursued the driver. (Dkt. No. 50-1 at 2); (Dkt. No. 52 at 30). The car briefly stopped in a parking lot before speeding away. (Dkt. No. 50-1 at 2); (Dkt. No. 52 at 30). Because Deputy Ivory was trained to recognize this kind of abnormal behavior as an indicator that a suspect was likely to resist arrest and may have just committed a serious offense, she radioed dispatch for backup. (Dkt. No. 50-1 at 2–3). She then chased the driver for several minutes until the driver finally stopped in front of a garage-type entrance to the Houston Livestock Rodeo Warehouse. (*Id.* at 3); (Dkt. No. 52 at 30); (Dkt. No. 52-1 at 00:00–00:25).

Because the driver's car was facing the entrance at this point, Deputy Ivory positioned her patrol car behind the driver to prevent another pursuit. (Dkt. No. 52 at 30); (Dkt. No. 52-1 at 00:00–00:25). While she waited for backup, Deputy Ivory

---

[1] Except where noted, this section contains only undisputed facts, and all facts and reasonable inferences have been construed in favor of the nonmovant. *Renfroe v. Parker*, 974 F.3d 594, 599 (5th Cir. 2020). The Court has not weighed evidence or made credibility findings. *Id.*

unholstered her weapon, opened her door, and stepped out of her car. (Dkt. No. 50-1 at 3); (Dkt. No. 52 at 30); (Dkt. No. 52-1 at 00:00–00:25). Deputy Ivory used her car door as cover and continued pointing her gun at the driver's vehicle. (Dkt. No. 30 at 33); (Dkt. No. 52-1 at 00:00–00:25).

Around this time, Gregory Schmid entered the scene on a golf cart. (Dkt. No. 52 at 33). Schmid was a security manager with ASM Global, an outside contractor that provided security to NRG Park. (Dkt. No. 50-2 at 4). Schmid arrived on the scene because he had received a radio call from Deputy Ivory informing him that she was pursuing an erratic driver through the parking lots. (*Id.* at 5–6).

Once Deputy Ivory positioned herself, she ordered the driver to exit the vehicle. (*Id.* at 7–8); (Dkt. No. 52 at 24). The driver refused. (Dkt. No. 50-2 at 8). After several reiterations, (*id.*), the driver exited her vehicle and casually, yet quickly, walked toward Deputy Ivory, (Dkt. No. 52 at 33); (Dkt. No. 50-1 at 3) (Dkt. No. 52-1at 00:25–00:30). That driver was Charisma Hannibal. (Dkt. No. 50-1 at 2).

As Hannibal approached, Deputy Ivory noticed Hannibal's left hand was in her pocket. (*Id.* at 3); (Dkt. No. 52 at 33); (Dkt. No. 52-1at 00:30–00:33). Deputy Ivory told Hannibal to remove her hand from her pocket. (Dkt. No. 50-1 at 3); (Dkt. No. 52 at 8); (Dkt. No. 52-1 at 00:33–00:34). Hannibal did not comply. (Dkt. No. 50-1 at 3); (Dkt. No. 52 at 33); (Dkt. No. 52-1 at 00:34–00:35). After Deputy Ivory asked again, Hannibal finally took her hand out of her pocket. (Dkt. No. 50-1 at 3); (Dkt. No. 52 at 8); (Dkt. No. 52-1 at 00:35–00:38). Deputy Ivory instructed Hannibal to stop moving forward, but to no avail. (Dkt. No. 50-1 at 3); (Dkt. No. 52 at 33); (Dkt. No. 52-1 at 00:38–00:51).

Deputy Ivory claims that Hannibal was staring at her firearm as she moved closer. (Dkt. No. 50-1 at 3). Fearing that Hannibal might take her weapon, Deputy Ivory backed up to create distance and de-escalate the situation. (*Id.*); (Dkt. No. 52 at 33); (Dkt. No. 52-1 at 00:46–00:51).

Hannibal then walked toward Deputy Ivory's patrol vehicle and looked inside, while Schmid moved the golf cart out of the way. (Dkt. No. 50-1 at 3); (Dkt. No. 52 at 33); (Dkt. No. 52-1 at 00:50–00:52). Deputy Ivory believed Hannibal would get inside the patrol car, so Deputy Ivory moved toward it. (Dkt. No. 50-1 at 3–4); (Dkt. No. 52 at 33); (Dkt. No. 52-1 at 00:52–00:54).

After a short exchange with Deputy Ivory, Hannibal started returning to her own vehicle. (Dkt. No. 50-1 at 4); (Dkt. No. 52 at 33); (Dkt. No. 52-1 at 00:55–01:15). Deputy Ivory followed her and told her not to move or get in the car. (Dkt. No. 50-1 at 4); (Dkt. No. 52 a 33); (Dkt. No. 52-1 at 01:15–01:39). Hannibal ignored Deputy Ivory, entered her vehicle, and shut the door. (Dkt. No. 52 a 33) (Dkt. No. 52-1 at 01:15–01:40). Deputy Ivory told dispatch that Hannibal was not following instructions. (Dkt. No. 52 a 33); (Dkt. No. 52-1 at 01:23–01:27). Deputy Ivory moved closer to Hannibal's vehicle while continuing to aim her sidearm at Hannibal. (Dkt. No. 52 a 33); (Dkt. No. 52-1 at 01:41–01:45). Eventually, Deputy Ivory positioned herself right outside Hannibal's driver-side door. (Dkt. No. 52 at 33); (Dkt. No. 52-1 at 01:41–01:45).

Hannibal "suddenly put her vehicle in reverse [and] gunned the engine," (Dkt. No. 50-1 at 4); (Dkt. No. 52 at 33); (Dkt. No. 52-1 at 01:45–01:49), and Deputy Ivory fired one round in response. (Dkt. No. 52 at 33). With her car now facing Deputy Ivory, (Dkt.

4

No. 50-1 at 4–5); (Dkt. No. 52 at 33), Hannibal drove toward Deputy Ivory, and Deputy Ivory fired eight more rounds at Hannibal, (Dkt. No. 50-1 at 5); (Dkt. No. 52 at 33); (Dkt. No. 52-1 at 01:50–01:54).

The bullets did not stop Hannibal. (Dkt. No. 50-1 at 5); (Dkt. No. 52-1 at 01:50–01:54). After Deputy Ivory's shots, Hannibal turned left, drove over a curb, and moved toward Schmid and Deputy Ivory's patrol car. (Dkt. No. 50-1 at 5); (Dkt. No. 52 at 33); (Dkt. No. 52-1 at 01:52–01:59).

Deputy Ivory told dispatch that shots were fired and then fired six more rounds to stop Hannibal as she drove over the curb, but Hannibal escaped. (Dkt. No. 50-1 at 5); (Dkt. No. 52 at 33); (Dkt. No. 52-1 at 01:58–02:01). Sixteen seconds had elapsed from Hannibal reversing her vehicle to Deputy Ivory firing the final six rounds. (Dkt. No. 52 at 33).

Deputy Ivory pursued Hannibal in her patrol car. (Dkt. No. 50-1 at 5); (Dkt. No. 52 at 33–34); (Dkt. No. 52-1 at 02:02–02:55). That pursuit ended at Gate 12, an exit gate. (Dkt. No. 50-1 at 5); (Dkt. No. 52 at 34); (Dkt. No. 52-1 at 02:55–02:56). Hannibal's vehicle faced the exit gate, so Deputy Ivory blocked it with her patrol car. (Dkt. No. 50-1 at 5); (Dkt. No. 52 at 34); (Dkt. No. 52-1 at 02:55–02:56).

Deputy Ivory next used her driver door as cover, pointed her gun at Hannibal's vehicle, and shouted for Hannibal to "[g]et out of the car" while she waited for backup. (Dkt. No. 52 at 34); (Dkt. No. 52-1 at 02:55–02:57). After Deputy Ivory repeatedly ordered Hannibal to exit the vehicle, Hannibal opened her door. (Dkt. No. 52 at 34); (Dkt. No. 52-

5

1 at 02:57–05:23). But a few minutes later, Hannibal closed it and stayed in the vehicle. (Dkt. No. 52 at 34); (Dkt. No. 52-1 at 05:23–06:51).

The Houston Police Department arrived on the scene and repeatedly used the police intercom to direct Hannibal to exit her vehicle. (Dkt. No. 50-1 at 5–6); (Dkt. No. 52 at 34); (Dkt. No. 52-1 at 07:35–10:58). Again, Hannibal refused. (Dkt. No. 50-1 at 5–6); (Dkt. No. 52 at 34). The Houston Police Department conducted a felony take-down arrest, and Emergency Medical Services transported Hannibal to the hospital. (Dkt. No. 50-1 at 6); (Dkt. No. 52 at 34).

In the aftermath of this event, investigators found five bullet holes in the driver's side door area, one bullet hole in the roof area near the sunroof, one bullet hole in the grill area on the front passenger's side, one bullet hole in the window trim on the rear passenger's side of the vehicle, one bullet hole in the center portion of the window on the door of the front passenger's side, four bullet holes in the front windshield area, and two bullet holes in the hood. (Dkt. No. 52 at 27, 29). Five of these shots struck Hannibal. (*Id.* at 1, 7, 25).

Because of these injuries, Hannibal's parents[2] originally sued (1) Deputy Ivory; (2) Harris County Constable Precinct One; and (3) Harris County, Texas (collectively, "Defendants") in state court on April 8, 2022. (Dkt. No. 1-1). Their claims included excessive force under 42 U.S.C. § 1983, assault, and emotional distress. (*Id.* at 4–5).

---

[2] When the incident occurred, Hannibal was seventeen years old. (Dkt. No. 52 at 2).

Defendants subsequently removed the case to federal court. (Dkt. No. 1). This Court dismissed Defendants Harris County Constable Precinct One and Harris County, Texas, but allowed the excessive-force claim against Deputy Ivory to proceed. (Dkt. No. 24). Later, the Court dismissed Hannibal's parents as plaintiffs because Hannibal turned eighteen. (Dkt. No. 26). The Court also amended the case caption to reflect the partial dismissal and ordered Hannibal to file a new complaint under her own name. (*Id.*).

Hannibal subsequently filed a Second Amended Complaint on September 23, 2022. (Dkt. No. 32). In this live complaint, Hannibal brings an action under 42 U.S.C. § 1983 alleging that Deputy Ivory used excessive force in violation of Hannibal's Fourth and Fourteenth Amendment rights. (*Id.* at 3–4). Deputy Ivory moves for summary judgment based on qualified immunity. (Dkt. No. 50).

## II. LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could affect the suit's outcome under governing law. *Renwick v. PNK Lake Charles, LLC*, 901 F.3d 605, 611 (5th Cir. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). And "[a] dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *TIG Ins. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir. 2002) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying the record evidence that "it believes demonstrate[s] the absence of a

7

genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).

If the movant meets this burden, the nonmovant must come forward with specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c); *see also Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The nonmovant must "go beyond the pleadings and by [the nonmovant's] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Nola Spice Designs, LLC v. Haydel Enters.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553). "The nonmovant must 'identify specific evidence in the record and . . . articulate the precise manner in which that evidence supports his or her claim.'" *Carr v. Air Line Pilots Ass'n, Int'l*, 866 F.3d 597, 601 (5th Cir. 2017) (per curiam) (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)), *as revised* (July 14, 2017). If evidence is merely colorable or not significantly probative, summary judgment is appropriate. *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019) (citing *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511).

In reviewing a motion for summary judgment, the district court views the evidence in the light most favorable to the nonmovant. *Carr*, 866 F.3d at 601. This means that courts must resolve factual controversies in the nonmovant's favor, "but only

when . . . both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075.

A qualified-immunity case changes the usual summary-judgment burden of proof. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.*

To overcome a qualified-immunity defense, a plaintiff must show that (1) the official violated a statutory or constitutional right and (2) the right was so "clearly established" at the time of the challenged conduct that a reasonable officer would be on notice that their conduct was against the law. *Ramirez v. Killian*, 113 F.4th 415, 421 (5th Cir. 2024) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011)); *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002) ("Officers sued in a civil action for damages under 42 U.S.C. § 1983 have the same right to fair notice as do defendants charged with the criminal offense defined in 18 U.S.C. § 242."); *see also Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

A plaintiff cannot establish these two prongs at the summary-judgment stage "with conclusory allegations or unsubstantiated assertions of wrongdoing." *Burke v. Masters*, 4:23-CV-00361, 2024 WL 1703085, at *7 (S.D. Tex. Apr. 14, 2024) (first citing *Mitchell v. Mills*, 895 F.3d 365, 370 (5th Cir. 2018); and then citing *Williams-Boldware v. Denton Cnty.*, 741 F.3d 635, 643–44 (5th Cir. 2014)). Instead, a plaintiff "must point to

9

specific evidence in the record demonstrating a material fact issue concerning each element of his claim." *Mitchell*, 895 F.3d at 370.

And if a video recording is provided, courts should also "'assign greater weight, even at the summary judgment stage, to the . . . video recording[s] taken at the scene.'" *Baker v. Coburn*, 68 F.4th 240, 244 (5th Cir. 2023) (alteration in original) (quoting *Betts v. Brennan*, 22 F.4th 577, 582 (5th Cir. 2022)), *as revised* (May 19, 2023). If "the video 'blatantly contradict[s]' either party's account," courts "'view[] the facts in the light depicted by the videotape.'" *Macias v. Watkins*, No. 23-40580, 2024 WL 3427047, at *2 (5th Cir. July 16, 2024) (alteration in original) (quoting *Scott v. Harris*, 550 U.S. 372, 380–81, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007)). Otherwise, courts draw all inferences in the plaintiff's favor. *Id.* (citing *Brown*, 623 F.3d at 253).

## III.   DISCUSSION

Hannibal alleges that Deputy Ivory used excessive force in violation of her Fourth and Fourteenth Amendment rights. (Dkt. No. 32 at 3–4). Qualified immunity protects government officials from civil liability to the extent that their conduct is objectively reasonable in light of clearly established law. *Crostley v. Lamar County*, 717 F.3d 410, 422 (5th Cir. 2013) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). The doctrine provides government officials with "breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Davidson v. City of Stafford*, 848 F.3d 384, 391 (5th Cir. 2017) (cleaned up). To overcome this defense, a plaintiff must plead facts showing "(1) that the official violated a statutory or constitutional right, and (2) that the right was

10

'clearly established' at the time of the challenged conduct." *Ashcroft*, 563 U.S. at 735, 131 S.Ct. at 2080 (quoting *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738).

Deputy Ivory focuses on the second prong. (Dkt. No. 50 at 1, 10–14). "The 'clearly established' prong is difficult to satisfy." *Cunningham v. Castloo*, 983 F.3d 185, 191 (5th Cir. 2020). A right is "clearly established" if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Cope v. Cogdill*, 3 F.4th 198, 204 (5th Cir. 2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (per curiam)). This standard is met only if "'the state of the law at the time of the incident provided fair warning to the defendants that their alleged [conduct] was unconstitutional.'" *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (alteration in original) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656, 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014)). Consequently, to establish that a constitutional right was "clearly established," a plaintiff must identify precedent that "'squarely govern[s]' the specific facts at issue." *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 337 (5th Cir. 2020) (quoting *Mullenix*, 577 U.S. at 15, 136 S.Ct. at 310). Courts must ask "whether the violative nature of *particular* conduct is clearly established." *Mullenix*, 577 U.S. at 12, 136 S.Ct. at 308 (emphasis in original) (quoting *Ashcroft*, 563 U.S. at 742, 131 S.Ct. at 2084). This constitutional question must be framed "'with specificity and granularity.'" *Cunningham v. Castloo*, 983 F.3d 185, 193 (5th Cir. 2020) (quoting *Morrow v. Meachum*, 917 F.3d 870, 874–75 (5th Cir. 2019)). In other words, a plaintiff generally must "'identify a case in which an officer acting under similar circumstances was held to have violated the Constitution' and explain 'why the case clearly proscribed the conduct of that individual officer.'"

*Cope*, 3 F.4th at 205 (cleaned up) (quoting *Bartlett*, 981 F.3d at 345). "While an exact case on point is not required," the specifics of the officers' violation must be "'beyond debate.'" *Id.* (quoting *Baldwin v. Dorsey*, 964 F.3d 320, 326 (5th Cir. 2020)). Specifically, "'the right's contours [must be] sufficiently definite that any reasonable official in the officer's shoes would have understood that he was violating it.'" *Baker*, 68 F.4th at 245–46 (cleaned up) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014)). Broad, general propositions of law are not enough. *Cope*, 3 F.4th at 205; *Ashcroft*, 563 U.S. at 742, 131 S.Ct. at 2084 ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality."). Put simply, "the law must be so clearly established that—in the blink of an eye, in the middle of a high-speed chase—every reasonable officer would know it immediately." *Martin v. Petty*, 699 F.Supp.3d 547, 557 (S.D. Tex. 2023) (quoting *Morrow*, 917 F.3d at 876).

Hannibal points to *Peña v. City of Rio Grande City*, 879 F.3d 613 (5th Cir. 2018), as the clearly established law governing this case. (Dkt. No. 52 at 9–10). According to Hannibal, *Peña* held that using a taser on a fleeing and unarmed "non-suspect" clearly violated that individual's rights under the Fourth Amendment. (*Id.* at 9). Therefore, Deputy Ivory's use of force was "suspect" and "clearly unwarranted." (*Id.* at 9–10).

The Court disagrees for multiple reasons. First, *Peña* did not hold what Hannibal claims it did: that using a taser on a fleeing and unarmed "non-suspect" violated clearly established law. In fact, *Peña* did not address qualified immunity at all. *Peña* instead held that the plaintiff sufficiently pled Fourth Amendment violations under Section 1983 against two officers but specifically declined to "decide whether said violations were

12

clearly established at the time of the incident." *Peña*, 879 F.3d at 618–21. Instead, *Peña* remanded the entire issue of qualified immunity back to the district court to decide in the first instance. *Id.* at 621.

Second, the facts in *Peña* are not similar enough to this case to "clearly establish" that Deputy Ivory's conduct was unconstitutional. *See Cope*, 3 F.4th at 205 (explaining that the second prong requires a plaintiff to "identify a case in which an officer acting under similar circumstances was held to have violated the Constitution, and . . . explain why the case clearly proscribed the conduct of that individual officer" (brackets omitted) (quoting *Joseph ex rel. Est. of Joseph*, 981 F.3d at 345)). In *Peña*, the officer tased an unarmed individual who was fleeing on foot, who was not a threat to officers or third parties, and who was not suspected of a crime. *Peña*, 879 F.3d at 616, 619. Not so here. Hannibal did not flee on foot as Deputy Ivory approached but drove at Deputy Ivory with her car. (Dkt. No. 50-1 at 5–6); (Dkt. No. 52 at 25, 33). Hannibal, who was armed, posed a threat to Deputy Ivory and Schmid when she drove her car—a potentially deadly weapon—in a dangerous manner toward them.[3] *See Fraire v. City of Arlington*, 957 F.2d 1268, 1273–77 (5th Cir. 1992) (observing that a vehicle can be a deadly weapon and that if an officer believes he or others around him are in danger from the vehicle, it can be reasonable to use deadly force). Ignoring an officer's commands to stop, Hannibal hit a curb, stopped only briefly, drove over it, and continued toward Schmid and Deputy Ivory's patrol car.

---

[3] Indeed, Hannibal has been charged with Aggravated Assault against a public servant. (Dkt. No. 52 at 25); *see* Tex. Penal Code §§ 22.01, 22.02 (defining Aggravated Assault in part as "threaten[ing] another with imminent bodily injury" using "a deadly weapon").

13

(Dkt. No. 50-1 at 4–5); (Dkt. No. 52 at 33). This erratic behavior posed a threat to anyone in the car's vicinity, including third parties such as Schmid. Finally, Hannibal was suspected of a crime when she fled because she was "driving erratically" and "traveling at a high rate of speed." (Dkt. No. 50-1 at 2); (Dkt. No. 52 at 30). These facts distinguish this case from *Peña*.

The caselaw from more similar encounters favors finding qualified immunity. For instance, the Supreme Court held that an officer did not violate a clearly established right when she shot the defendant in the back as he tried to flee by jumping into a car, starting it, and driving away after evading on foot. *Brosseau v. Haugen*, 543 U.S. 194, 194–97, 199–201, 125 S.Ct. 596, 596–600, 160 L.Ed.2d 583 (2004) (per curiam). More recently, the Supreme Court relied on *Brosseau* in holding that officers were entitled to qualified immunity when they fired fifteen shots to stop the individual from continuing to flee in his car. *Plumhoff*, 572 U.S. at 768–70, 778–81, 134 S.Ct. at 2016–18, 2022–24. And in line with the Supreme Court, the Fifth Circuit has held that a police officer was justified in using deadly force against an accelerating car when the officer was near the car and had an "extremely brief period of time . . . to react" to the situation. *Hathaway v. Bazany*, 507 F.3d 312, 322 (5th Cir. 2007); *see also Irwin v. Santiago*, No. 21-10020, 2021 WL 4932988, at *3 (5th Cir. Oct. 21, 2021) (determining that officers who shot at the individual's vehicle were entitled to qualified immunity when the individual ignored commands to stop, one officer was standing toward the front of the vehicle as it started to move, and there was only a "brief period of time" for the officers to react).

14

While this Court acknowledges that "absent any other justification for the use of force, it is unreasonable for a police officer to use deadly force against a fleeing [individual] who does not pose a sufficient threat of harm to the officer or others," *Lytle v. Bexar County*, 560 F.3d 404, 417 (5th Cir. 2009), that situation is not presented here. As explained above, Hannibal posed a threat to Deputy Ivory and a third party. At a minimum, the safety of Deputy Ivory and others was not so certain as to render it "beyond debate" that Duty Ivory violated Hannibal's constitutional rights by treating Hannibal's actions as life-threatening. *See Ashcroft*, 563 U.S. at 741, 131 S.Ct. at 2083. Accordingly, Deputy Ivory's use of force did not violate clearly established law.

## IV.   CONCLUSION

For the above reasons, Defendant Sharmayne Ivory's Motion for Summary Judgment, (Dkt. No. 50), is **GRANTED**.

It is SO ORDERED.

Signed on February 14, 2025.

_____
**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**